THE STATE OF WYOMING

*Plaintiff and Respondent*

vs.

JAMES V. ALEXANDER

*Defendant and Appellant.*

(No. 2799; April 29th, 1958; 324 Pac. 2d 831)

For the defendant and appellant, the cause was submitted upon the brief of Layman and Stewart, of Casper, Wyoming, and oral argument by Mr. Allen H. Stewart.

For the plaintiff and respondent, the cause was submitted upon the brief of Thomas O. Miller, Attorney General, and William A. Riner, Deputy Attorney General, of Cheyenne, Wyoming, and oral argument by Mr. Riner and Mr. Raymond B. Whitaker, County and Prosecuting Attorney of Natrona County, Casper, Wyoming.

Heard before Blume, C.J., and Harnsberger and Parker, J.J.

328

## OPINION

Mr. Justice HARNSBERGER delivered the opinion of this court.

Defendant, who was informed against and tried for

the first degree murder of Barbara Alexander, his wife, was convicted by a jury and adjudged guilty of murder in second degree. He was sentenced to serve a term of not less than 45 years nor more than 65 years in the Wyoming State Penitentiary, and to pay a fine of $1,000 plus costs of prosecution amounting to $6,-435.56. Defendant appeals from that judgment and sentence.

In preamble to appellant's argument, it is stressed that "because of the sensational elements of the crime defendant was accused of committing, he was denied a fair and unbiased trial". No supporting authority is offered. To recognize substance in such a claim would indicate that the more heinous the crime, the more certain it would be that there was error in trying an accused for its commission.

After the court had overruled defendant's Motion to Quash the Information herein, defendant filed his Plea in Abatement upon grounds that the transcript of testimony given before the justice of the peace at the preliminary hearing and attached to the plea failed to show defendant caused the death of the deceased; premeditated malice; that murder in the first degree had been committed; probable cause for holding defendant to answer to the charge and binding defendant over to the district court on the charge of murder in the first degree in consequence of which the justice of the peace was said to have exceeded her jurisdiction.

The court denied the plea, finding:

" * * * that such a plea does not permit the District Court to review the transcript of proceedings held before the Justice of Peace on the questions of whether or not the offense charged in the complaint had been committed and whether or not there was probable

cause to believe the defendant guilty of the offense."
Counsel insists this was contrary to the rule set forth
in State v. Baish, 32 Wyo. 136, 230 P. 678, where it was
held that a copy of the transcript of the testimony giv-
en at a preliminary hearing could only be brought in-
to the records by a plea in abatement . In so holding
the court cited § 7484 C.S. 1920, now § 10-810, W.C.S.
1945, authorizing a plea in abatement when there is a
defect in the record shown by extrinsic facts. Upon
examining the cases upon the subject, particularly
those cited in Annotation, 59 A.L.R., at pages 567
through 579, we find some division of opinion as to the
propriety of an examination of the evidence given be-
fore a grand jury or at a preliminary examination to
determine its sufficiency to warrant a returned indict-
ment or a holding for trial with subsequent informa-
tion, as is the case of the procedure followed in this
case. United States courts, and those of Alabama,
Georgia, Missouri, Nevada, New York, North Carolina,
Oklahoma and Pennsylvania are among those which
have held that a complete lack of evidence warrants
the dismissal of a grand jury's indictment. Such hold-
ings obviously required an examination of the tran-
script. California, Mississippi, New Mexico have held
that courts will not inquire whether there was any evi-
dence to support the indictment. United States courts,
and those of Alabama, California, Georgia, Illinois,
Louisiana, New York, Ohio and Virginia are among
those holding there is a prima facie presumption the
indictment is founded on sufficient evidence. Such
holdings seem to imply the transcript of evidence might
be examined, else there would be no way to refute the
presumption. Otherwise the presumption must be con-
sidered conclusive.

In other decisions the United States courts, Alaba-
ma, Arkansas, California, Georgia, Idaho, Illinois, In-
diana, Iowa, Kentucky, Louisiana, Mississippi, Miss-

ouri, Nevada, New Mexico, Oregon, Pennsylvania, South Carolina, Texas, Virginia and West Virginia have held mere insufficiency of evidence is not ground for quashing and the court will not inquire. In summary, we might be justified in concluding the court should examine the transcript, when available, at least for the purpose of ascertaining if there was any evidence to warrant the indictment or holding. It is, however, unnecessary to expound the question because our examination of the transcript clearly shows there was ample evidence to warrant holding defendant for trial in the district court. Where a correct judgment, or order, has been made which contains inaccurate or erroneous declarations of law such declarations are harmless error and not grounds for reversal. It is generally held that in actions tried by the court without jury, error cannot be predicated upon such erroneous declarations if the court made proper determination of the case. This leaves us with little doubt but that the correct ruling upon the plea in abatement, even though prompted by the incorrect theory that it was not permitted to review the transcript to ascertain the sufficiency of the evidence, relieves from the charge that reversible error was committed. See 5 C.J.S. Appeal and Error § 1778, p. 1171, § 1849, p. 1334. Thus we hold that the correct ruling is not adversely affected by the wrong reasons given therefor. See 4 C.J.S. Appeal & Error § 153, p. 517; 3 Am.Jur., Appeal and Error, § 1008, p. 563, § 1163, p. 674; 49 C.J.S. Judgments § 71a, p. 189. See also Peterson v. Johnson, 46 Wyo. 473, 483, 484, 28 P.2d 487, 489, 91 A.L.R. 723.

While living in Casper and married to Rose Alexander, who bore him two children, defendant met and brought to live in his small home at Casper, with his wife, himself and their two children, one Barbara

Rupe, a married woman, herself the mother of two children who accompanied their mother to live in defendant's home. In a short time defendant divorced his wife Rose who, at defendant's request, signed certain papers presumably having something to do with the divorce, the nature and contents of which not being shown by the record. However, Rose received nothing when defendant was granted the divorce, either as alimony, property settlement, maintenance or custody of her minor children.

Immediately following this divorce, defendant married Barbara, who by that time had also become divorced, but defendant, Barbara, Barbara's two children, Rose, and Rose's two children, a total of seven persons, all continued to live together in the same house, and defendant and Rose continued to sleep in the same room for about a week. About eight months after her marriage to defendant, Barbara gave birth to child and this made a total of eight persons in the home. Finally, Barbara objected to the living arrangements, and defendant sent Rose to her former home in Connecticut, but shortly thereafter she returned to Casper. Defendant gave Rose money while she was away and also sent her the money to enable her to come back to Casper. On her return, Rose went to live in a trailer house immediately behind defendant's home and she stayed there about a week before she went to live in another of defendant's trailer houses. This was situated near the edge of town and defendant, from time to time, brought her foodstuffs and supplies. After a month or so, Rose went to defendant's home and took her two children and kept them with her in the trailer, but later when school started they returned to live in defendant's home. When Barbara learned that defendant was going out to the trailer where Rose was living, the parties quarreled and Barbara threatened to leave defendant.

In June, 1953, defendant raised the water meter in his basement so it could be read from outside the basement window and he also had Barbara sign some blank conveyancing deeds. The last time Barbara was known to have been seen alive by anyone, other than the defendant or possibly by her children who may have seen her later the same evening, was the late afternoon of Saturday, July 18, 1953, when she was at the home of a next door neighbor. When Barbara left there sometime after four o'clock in the afternoon, she agreed to return the next day. That evening about ten o'clock or later both male and female voices and a commotion were heard coming from defendant's home, after which a car resembling defendant's automobile was seen leaving defendant's back yard going fast around the house and down the alley. From that time on defendant kept the basement door nailed shut. The next day defendant brought Rose to his home, after which she continued to live there with defendant, her own and Barbara's three children, until sometime later when the defendant moved to Worland.

On Monday, July 20, 1953, defendant left Casper and did not return until the latter part of August, 1953. Defendant then proceeded to lay a concrete floor in the basement of his home over an area approximately seven feet wide by twenty-four feet long, which up to that time had not been covered with concrete as was all the rest of the basement. Defendant told various persons different stories about Barbara's absence. For instance, he said his wife was dead; she was lying in dry cement and lime; she had left him; she had threatened suicide; he had seen her on the street; he dreamed she had come to him; when he slept in the basement he felt close to her; the police or other authorities were searching for her and he made several other statements tending to account for her disappearance. In the fall of 1953, the de-

fendant said in a letter, "Never do I feel as near my beloved Barbara as when I sleep in my basement". When an acquaintance told him officers thought he had Barbara in a pit he was digging, defendant replied, "I don't have her in the pit, I have her in the basement". Although he had written Barbara's parents on September 5, 1953, that Barbara had taken a vacation from "home and marriage", thereafter he wrote them postcards signed "The Alexanders" and later he went to their home in Montana. Not finding her parents there, he left a note saying, "We have been here but couldn't wait. Sorry. The Alexanders", thus leaving it open to inference that Barbara had been there with him. Defendant also voiced his suspicion that Barbara was "chippying" on him and had said he was going to get even with that "two-timing bitch". Defendant also said, "I am going to get rid of that two-timing bitch", and when told he could not get away with it replied, "I can get away—Oh, I can, I can get away with anything" and repeated "I can get away with anything". When punishing one of the children he said he ought to kill the mother. He boasted of his ability to kill with one blow; said he wanted a skeleton; offered to do away with another person for his tenant, and told about the most perfect crime being committed where the perpetrator was supposed to have buried his wife in concrete. Finally on March 14, 1954, defendant went to the sheriff of Natrona County and told him his wife had been missing "since last August". The sheriff's office commenced making routine missing-person inquiries. Afterward, toward the very last of August, 1954, and while they were making investigation of a theft in the neighborhood of defendant's home, certain developments caused the authorities to further pursue their investigation concerning Barbara.

On September 3, 1954, the officers interrogated de-

fendant who appeared nervous when they asked him as to why he had not sooner reported his wife as missing. They had defendant take them to his home where they met Rose, looked around the house, were shown Barbara's personal effects which were in boxes and lockers, and they went down in the basement where they observed the concrete in the seven by twenty-four foot area above referred to was of a different color and had broken lines in it.

On September 24, 1954, defendant made a statement to officers the highlights of which were that on July 18, 1953, he went to bed at 9:30 p.m. with everything normal between Barbara and himself, and that he awoke the following morning and found Barbara was not in the house so he thought she had gone to church. The investigation continued and on November 29, 1955, at Worland, Wyoming, where the defendant had moved, he gave a written signed statement to the officers in which, among other things, he said: that he had seen Barbara on the street in Casper around Thanksgiving, 1953, and that his children told him they saw her drive by the house after July 19, 1953; that at the time of her disappearance Barbara had anywhere from $800 to $1,000; that when he sold lots which were in his name "her signature was necessary for a clear title because of her being my wife"; and that he had reported Barbara missing to the sheriff's office about eight weeks after her disappearance which last statement was shown to be untrue.

On the afternoon of December 5, 1955, Rose, the defendant and his attorney all went to the Casper police. The record does not reveal all that transpired there, but defendant gave his written consent to the authorities to dig up the basement of his house, and that evening about 10:45 p.m., in the presence of defendant, his attorney, law officers, doctors and a photographer,

Rose designated a spot on the newly concreted portion of the basement floor as the place to dig. After outlining that area with boards in accordance with Rose's instructions, the officers proceeded to make an excavation. During this digging, defendant and Rose went outside. Upon removing the concrete the officers found the earth below packed and hard, but they went ahead and dug a hole some four feet long, three feet wide and about eight inches deep. When they did not find anything there, the officers brought Rose and defendant back into the basement and asked them to show a little more definitely where the body was. Rose stood there with a handkerchief up to her mouth, the defendant standing beside her. She looked down at the hole being dug and said, "I can't understand it, she should be there". A complete silence followed, but an officer who was looking at defendant testified his lips were moving and that "he made a waving motion with his right hand in an easterly direction". Rose gave no further instruction and the officers then proceeded to dig two feet to the east of their first hole and uncovered the head of Barbara. Her remains were carefully exhumed and photographs and x-rays were taken of the skull and the skeleton.

An examination of these pictures, as well as of the skeletal remains, disclosed that an impact to the left side of the head with a flat object caused severe multiple fractures of the skull which expert witnesses ascribed as being the cause of death. The examination did not reveal any other injuries. On the left side of the skull the injuries were described as being a stellate fracture with radiating small fractures from it near the junction of the parietal and temporal bones representing a point of impact with rutting fracture. At the junction between the right parietal bone and the right portion of the frontal bone, the suture line had been split apart and the split extended downward

and frontward through a portion of the sphenoid bone with a fracture of that bone and an extension of the fracture line backward. Another fracture extended from the base of the nose upwards and backwards. What were said to be secondary fractures appeared on the right side of the skull and their presence was said to be consistent with a single blow to the left side of the skull producing the stellate fracture above described, and these were explained as occurring through transmission of force through the skull from the blow to the left side of the head. There were additional fractures across the base of the skull between the initial fracture on the left side and the secondary fracture on the right side and on the frontal portions of the skull. These were across the base of the skull and were multiple smaller fractures involving various bones.

The only clothing found in the grave was a part of an undergrament, although there was also a small portion of what appeared to be a sheet. Underneath and around the remains, a quantity of neat or pure cement was found in an amount estimated to be approximately 200 to 250 pounds. The only jewelry was a small diamond ring of the type usually taken to be an engagement ring. This was on the finger bones of the ring finger of the left hand. Nothing else of a personal nature was found with the remains, such as money, a purse, etc. A small wood stake, a wooden cross, and a tin can were removed from the excavation and samples of the earth were taken and analyzed, but these items seemed of little if any evidentiary significance unless it was because defendant was shown to have made similar crosses. The hair of the deceased was removed and it was given laboratory examination.

At the coroner's inquest, held over the remains of Barbara, the defendant was present and represented

by his attorney. Defendant freely and voluntarily gave testimony. Rose was arrested and charged with the first degree murder of Barbara, and at her preliminary examination defendant again testified freely and voluntarily under the same conditions. Later the complaint charging this defendant with first degree murder was filed and the defendant and Rose remarried. At his trial defendant again gave testimony.

It would serve no good purpose to here recount at length these several testimonies of the defendant nor even to attempt to summarize their substance. We content ourselves with saying that they were so fraught with discrepancies and inconsistencies that the jury would have been justified in discrediting those portions which, if believed, would have been favorable to defendant, and in concluding that defendant was attempting to conceal the fact that he knew Barbara had been killed and interred in his basement. Rose also gave testimony at both the inquest and at defendant's trial to the effect that she had witnessed Barbara's death when she fainted and fell about four feet from a catwalk on defendant's premises and landed on a small concrete platform. Her evidence, like defendant's, was replete with discrepancies and inconsistencies, and furthermore the defendant's evidence and the evidence pf Rose was in irreconcilable conflict on some points. This, of course, would have given the jury additional grounds for concluding there was a studied attempt by both defendant and Rose to mislead them as to the facts surrounding Barbara's death and to persuade them to believe that her death was accidental rather than a homicide.

This recapitulation, although showing the evidence to be for the most part circumstantial, was, nevertheless, sufficient to support the jury's verdict that defendant was guilty of murder in the second degree.

The type of blow which caused death, as evidenced by the shattered condition of the skull, was of such extreme force and violence that it was not explainable as being the result of the fall Rose described. As defendant's own physician witness testified, a person having such a fall would only receive a fracture at the point of contact without fractures elsewhere. The defendant, by his own testimony, was present in the house where Barbara was last known to be alive and where she was known to be at that time. As far as any credible testimony shows, defendant and deceased were the only adult persons in the house at that time and at the time when both male and female voices and a commotion were heard coming from the house. After that Barbara was not again seen alive.

There had been a quarrel between defendant and Barbara over the defendant's former wife, Rose, and defendant was accusing Barbara of "chippying" on him and had called her "a two-timing bitch". The whole background of sordid conditions and relationships portrayed obvious additional reasons for the existence of ill feeling and provided motive for the defendant to rid himself of one of his women. His conduct in hastily leaving Casper after July 18, 1953, and returning only when there seemed to be no furor or official inquiry about Barbara's disappearance; his prompt laying of concrete over her grave upon his return; his failure to promptly report her disappearance to constituted authorities; his report of seeing her alive on the streets of Casper; his sly suggestion of her being a suicide; his misleading note to Barbara's parents—all tended to establish his definite purpose to conceal and to mislead. These and many other circumstances, intensified by defendant's convenient failure to recall certain important matters while displaying a remarkable memory for other details which defendant

evidently deemed to be in his favor, all combined to build a chain of circumstances that was compatible with no other reasonable theory as to the manner in which Barbara came to her death, but that it was at the hand of defendant himself acting purposely and maliciously. This leads us to conclude that the evidence was sufficient to support the verdict, judgment and sentence.

We must next examine the record to ascertain if any evidence was improperly received to prejudice the defendant's rights. One of appellant's objections is that there were a number of photographs, introduced in evidence over his objection, which were unnecessarily inflammatory and which, therefore, prejudiced the jury against the defendant. These were some eleven photographs showing different views of exterior portions of defendant's house; eight photographs, showing progressively, the uncovering of the remains; a full-length picture of those remains after their removal from the grave; four close-up photographs of the skull, each taken from a different angle and showing some of the fractures about which the doctors gave testimony; a number of pictures showing interior views of defendant's basement, the concrete floor, its cracks and the excavations made; and x-ray plates showing the fractured skull and the intact condition of other parts of the deceased's body structure. While some of these graphic depictions are not pleasant to look upon, and, in fact, are somewhat gruesome, we cannot say that they were not proper and necessary to be placed before the jury in order that they be enabled to get a proper perspective and an understanding of the testimonies that were given in connection with them. This objection of the appellant must be overruled.

Appellant also complains that defendant did not receive a fair trial because of the prosecuting attorney's

statements made in his opening statement. Notwith-
standing this criticism, appellant fails to specifically
point out the particular remarks which are considered
prejudicial but seems content to merely refer to the
whole statement. However, we have critically exam-
ined the state's opening statement but fail to find any
improprieties.

Appellant says state's counsel made unwarranted
and prejudicial remarks in front of the jury and our
attention is invited to instances of these criticized re-
marks made in the jury's presence. Their general
character is illustrated by the following: "Will the
upper row step down and look"—"Would any of the
members of the jury like to see any other cement in
there? If they would we could open the whole thing
up but to save time we thought we got a representa-
tive bag of it"—"Can the jury see certain portions of
the Exhibit?"—Is there anyone who would like to
see?"—"Can the jurors see this?"—"Can you hear the
witness?" With the exception of the last quote, we
note there is nothing in the remark to indicate if it
was addressed to the court or directly to the jury. In
any event, while we disapprove of any counsel address-
ing the jury except at proper times when it is expected,
none of the remarks nor the fact of their being made
in the jury's presence was prejudicial to the defend-
ant. While a few other remarks by state's counsel
are objected to as improper, we consider those objec-
tions to be entirely without merit, except perhaps in
one instance when defense counsel was cross-examin-
ing a state's witness who had testified that Barbara,
while talking to the witness and the witness' husband,
had been uneasy. Defense counsel then asked, "What
do you mean uneasy?" To this question the witness
replied, "Well, while I was there she told my husband
and I that he [the defendant] had threatened to kill

her." Defense counsel moved to strike the answer as not responsive whereupon the prosecutor said, "One moment, your Honor, he asked for it and he got it". The court ruled the answer of the witness was responsive, but directed the jury to disregard the prosecuting attorney's remark and told them that they should not let it affect their consideration in any way. It is even doubtful that the remark was objectionable at all, as it was proper for counsel to state his reason for contesting the defense motion to strike, and the ruling of the court indicates it considered the reason given to be valid, inasmuch as the witness' answer was permitted to stand. However, as the jury was instructed to disregard the remark and not to let it affect their consideration in any way, no prejudicial error resulted.

Other objections are made that certain evidence admitted was without relevance or materiality. We consider that evidence to have been relatively unimportant and its reception to be without prejudice to the defendant. In cases which altogether depend upon circumstantial evidence or which in large part rest upon circumstances, considerable latitude must be given and the admission or rejection of that type of evidence must be left largely to the sound discretion of the trial court. We do not find that discretion was at all abused and, consequently, overrule those objections.

The complaint that defendant was subpoenaed and required to testify at the preliminary hearing of Rose Alexander and then after a few preliminary questions was ruled to be a hostile witness is inaccurate, as the record shows it was only after defendant had given testimony represented by twenty-five pages of the transcript of evidence given at that hearing that the justice ruled defendant to be a hostile witness. The

responses, theretofore made by defendant to questions propounded to him, justified that ruling.

Appellant further claims error because the state's evidence tending to show defendant's efforts to conceal true facts and mislead the jury concerning Barbara's disappearance incidentally involved references to the enclosure of the alleged catwalk. Because of this it is said the state anticipated the defense that Barbara died as a result of a fall from a catwalk, and, therefore, it was error to permit the state to give further evidence about the catwalk on rebuttal to show the alleged catwalk was not completely enclosed on July 18, 1953, but was exposed to view due to prior removal of one side of the enclosure. Our attention is called to Russell v. State, 19 Wyo. 272, 284, 116 P. 451, 454, where it is said:

"The general rule is that, if the plaintiff sees fit to call any evidence in anticipation of a defense, he should be required to then produce all of his evidence on that subject, and should not be allowed to split his evidence in two parts, and to give one part in chief and the other in rebuttal. Orderly procedure in the trial would require this. However, the rule is not an arbitrary one, and the trial court is allowed considerable latitude in the exercise of its discretion in that respect. * * * "

There are two things which relieve the court's action from error. First, the evidence received was not given in anticipation of any defense, but, in connection with other evidence, was legitimate proof of an element material to the establishment of the state's theory. Second, as the final sentence of the above quote indicates, the court is allowed considerable latitude in admitting or rejecting rebuttal evidence. In 6 Wigmore on Evidence, 3d ed., § 1873, pp. 510-512, difficulty of discriminating between an occasion when rebuttal testimony may or may not be properly received is pointed

out and attention is called to the possible unfairness to an opponent who has justly supposed that the case in chief was the entire case which he had to meet. The appellant's position here is just that. In other words, it is claimed that because the state's case in chief included previous testimonies of defendant and Rose which purported to describe an enclosure around the alleged catwalk, the defense was lulled into belief that the state accepted those representations as true with the result the defense offered no further proof concerning the existence of the enclosure on July 18, 1953, although the truth of that fact was necessary to complete the defense upon which the defendant was to rely. The point, however, is not well taken primarily because there was no issue concerning the matter until the fact was offered as part of the defense and secondarily because the testimony tended to prove the state's theory of concealment rather than to anticipate defense. At page 517 of Wigmore's same volume, it is flatly stated the court's determination of what is properly rebutting evidence should be respected and, furthermore, says that such rebuttal is always admissible to impeach, and, we add, to contradict the defendant, opponent or his witnesses.

The additional claim of error in not allowing defendant surrebuttal evidence is also not well taken because it could only amount to adding further and cumulative evidence to facts already testified to by a defense witness and which it was his opportunity to emphasize when he offered his defense in chief. We, therefore, agree with Wigmore's summation of the manner when he wrote at page 517:

"In general, such discretionary variations should be liberally dealt with; for nothing can be more irrational or more unjust than to apply the judicial lash of a new trial to errors of trivial importance."

Defendant's offer to prove upon surrebuttal that on July 18, 1953, there were certain variations in the area where the alleged catwalk was supposed to have been from the conditions depicted by one of state's exhibits does not indicate or specify why that evidence could not have developed on cross-examination or in presenting his defense in chief. While it is true, as explained by Wigmore, supra, § 1874, pp. 517-518, and 1 Chamberlayne, The Modern Law of Evidence, § 383, pp. 516-517, that new facts brought out on rebuttal may properly be met by surrebuttal evidence, that rule does not permit surrebuttal merely to supply evidence which could have been given in chief or to cumulate additional evidence or to fortify evidence already given, or to supplement such evidence because it has been impeached upon rebuttal. The description, type, size, location, condition and relation to other matters of alleged physical conditions, which in this case was the enclosure of the alleged catwalk, were all matters associated with the accused's defense and were testified about by defense witnesses. Defendant's assumption that the state would accept the defense description of these matters as being accurate did not prevent that testimony being contradicted upon rebuttal, yet on the other hand, when such contradicting rebuttal testimony is given, the right to challenge it by surrebuttal does not always result, but its allowance rests in the sound discretion of the court. 6 Wigmore on Evidence, 3d ed., § 1873, pp. 516-517.

The case here is not one where the prosecution sought to establish the existence of, or any fact relating to, the alleged catwalk. Such evidence was wholly unnecessary to the state's case. It was only when the defendant sought to account for Barbara's death as being an accident that the existence of the alleged catwalk's enclosure became important as an issue. Defendant's evidence was that the catwalk was

enclosed. The state's evidence indicated that it was not.

Anticipating the defense, or purposing to anticipate the defense, should not be taken to mean every introduction by the prosecution of evidence which merely touches some phase of a matter which is later disclosed as incident to the defense. To anticipate the defense has reference to the prosecution's introducing in its case in chief evidence calculated and intended to meet, contradict, explain, repel, counteract, disprove, modify or overcome evidence which is expected to be offered and relied upon as a defense to the crime charged. The references to the catwalk which occurred in presentation of the state's case was not evidence calculated or intended to meet, contradict or overcome any defense offered. See 23 C.J.S. Criminal Law, § 1049, p. 449.

Appellant claims error because of the denial of his offer of proof which was to be made by propounding a hypothetical question to a medical expert and based upon testimony given by Rose as to the manner in which Barbara met her death. During his examination of the witness, defense counsel stated:

"We wish to present a hypothetical question to the witness to this effect: That the deceased was standing on a catwalk or platform 4 feet above the ground and fell from this catwalk and dislodged bricks from a rock pile adjacent to the catwalk—* * * brick pile, yes; after falling, the bricks—one or three or more—no, one or three of weights from 7 pounds to 11 pounds struck the decedent on the left side of the skull of the deceased—whether or not this fall together with the bricks falling from a height of approximately 4 feet could have caused the fracture and the multiple fractures appearing in Exhibits 32, 33, 34 and 35?" [The exhibits referred to being photographs of deceased's skull.]

The court volunteered:

"I think it is speculation by reason of assuming into the picture that which isn't supported; that is the striking of bricks on the head of this girl."

The defense then inquired, "The offer of proof is rejected?" to which the court replied, "That is right". It is evident that the court's use of the phrase "into the picture" was not a reference to either or any of the photographic exhibits, but rather referred to the premise assumed by the question. As no evidence, either circumstantial or direct, had been given which even tended to prove that the bricks did strike the head of the deceased, the court's ruling was correct inasmuch as the hypothetical question assumed facts not in evidence.

Error is claimed because the court rejected a defense offer to prove defendant had adequate funds to make a loan of money. We fail to recognize any probative value in such evidence. Although counsel suggested its relation to the $800 to $1,000, which evidence had shown the deceased to possess at the time of her disappearance, the offered evidence would not in the least account for those monies.

During the cross-examination of a state's witness testifying on rebuttal in connection with an exhibit purporting to show the alleged catwalk area as described by the defendant to officers, defendant offered to prove the biggest part of the area involved had been excavated so that defendant was left without land marks to guide him when he gave the description. Such proof, if received, would have been valueless to prove there was any inaccuracy in the description given and would have been of no probative value. The refusal of the offer was, therefore, without prejudice to defendant.

· One instruction offered by defendant and refused by the court was as follows:

"You are instructed that where the sole witness of a transaction charged as a crime has testified, that testimony cannot be arbitrarily rejected and, if the credibility of the witness has not been impeached and her testimony is not improbable and is not inconsistent with circumstances shown but is reasonably consistent therewith, then her testimony should be accepted."

Appellant says that in Eagan v. State, 58 Wyo. 167, 128 P.2d 215, this court adopted the rule:

"The defendant being the sole witness to the transaction charged as a crime, her testimony must be accepted as true, as it * * * is not improbable, and is not inconsistent with the facts and circumstances as shown, but is reasonably consistent therewith * * *."

and reiterated the same in State v. Helton, 73 Wyo. 92, 276 P.2d 434. The above quote is not taken from the Eagan case, but does appear in the Helton opinion at page 114 in 73 Wyo. 92, and at page 442 in 276 P.2d 434, where reference is made to the consideration which should be given statements made by an accused explaining testimony relied on by the state to prove a necessary element of the crime charged. When taken out of context, as counsel now attempts to do, it is misleading and inaccurate. The full statement in the Helton case was:

" * * * It [the state] did, however, elect to rely upon the testimony of the defendant to prove necessary elements of its charge and, under the law of this state, as announced in Eagan v. State, 58 Wyo. 167, 198, 128 P.2d 215, 226, the defendant being the sole witness to the transaction charged as a crime, her testimony must be accepted as true, as it ' * * * is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith * * *.'"

State v. Helton, 73 Wyo. 92, 114, 276 P.2d 434, 442.

In the case before us, the witness was not the accused and the state had not relied upon the witness to prove any necessary element of the crime charged. In fact, the state's evidence in the case at bar was opposed to the testimony of the witness who was claiming to have witnessed the death of Barbara. The offered instruction was, therefore, completely misleading, did not state the law and was properly refused.

Another alleged error is that the court refused to give some six instructions which defendant offered. It is unnecessary to set these forth at length or recite their substance. Examination satisfies us that the matter dealt with in the refused instructions is sufficiently covered by instructions given. Similarly, defendant complains of certain instructions given. A major criticism is that two of the instructions conclude with statements "you should find him guilty" and "you should find the defendant guilty". While care must be taken not to overemphasize either guilt or innocence in the instructions, we must hold that defendant's criticism is not warranted in this case because we must assume the jury did as they were directed, and in considering all of the instructions as a whole, they gave proper weight to other instructions relating to innocence.

Appellant also says the court failed to provide a competent court reporter. Although appellant confesses there are no apparent prejudicial defects in the record, counsel insists there are evidences of an incomplete record. The statement is ambiguous and we do not agree.

Finally, it is advanced that the costs have been improperly assessed. The schedule of costs was made

prior to our decision in Arnold v. State, Wyo., 306 P.2d 368, which is now, of course, controlling. This requires that the costs be reassessed to conform with that pronouncement. The judgment and sentence in this case are affirmed, with the exception of costs taxed and the case is remanded with direction to properly reassess the costs and for execution of the judgment and sentence as so modified.

MODIFIED AND AFFIRMED.

### ON REHEARING

On June 10, 1958, the Court denied a rehearing without a written opinion.