Richard S. LaFLEUR, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4378.

Supreme Court of Wyoming.

April 1, 1975.

Phil N. Nash, John E. Ackerman and Ronald L. Brown, Casper, for appellant.

David B. Kennedy, Atty. Gen., and Timothy J. Judson, Asst. Atty. Gen., Cheyenne, for appellee.

Before McCLINTOCK, RAPER and THOMAS, JJ.

McCLINTOCK, Justice.

Richard LaFleur [1] appeals his conviction and sentence by the District Court of Na-

---

1. Also known as Raymond Landry and frequently referred to in the record by that name.

In this opinion he will be referred to as defendant.

trona County, Wyoming on the charge of breaking and entering with intent to steal. He was apprehended early in the morning hours of Tuesday, December 19, 1972, inside the Westridge drugstore at Casper, while in the act of removing from a shelf a bottle of liquid later identified as Robitussin cough syrup. Entry to the building had been effected after one Steven Raleigh had smashed the glass in a rear door. After waiting some five minutes to see if the crash had been observed by anyone defendant proceeded into the building. Unfortunately for him the Casper police had been alerted to the possible burglary of the store by one Robert Laabs,[2] described as an undercover narcotics agent employed by the Casper police force, and two police officers were in the building at the time of the break-in. Raleigh did not enter the building and quickly departed the area when other police converged on the building. He was found and arrested in the close vicinity of the drugstore, and LaFleur, Raleigh, and one Willie Mapp,[3] an alleged principal in the burglary, were tried together before a jury.. Defendant was found guilty and sentenced to from 10 to 14 years in the Wyoming state penitentiary.

On this appeal defendant contends that his defense of entrapment was established as a matter of law and a verdict of acquittal should have been directed. He also asserts error of the trial court in instructions given and refused, and in permitting a State witness to testify to certain facts upon rebuttal instead of as part of the State's case in chief.

Shortly prior to the burglary defendant, his wife, and Raleigh, without apparent purpose and with little or no funds, had been engaged in a rambling trip that took them from Texas to California to Washington and into Wyoming. North of Casper the car broke down and the three hitched a ride into Casper where the Salvation Army obtained lodging for them at a local hotel and also furnished them with some meals.[4]

While staying at this hotel and on Thursday, December 14, 1972 they met Robert Laabs who had that morning been sworn in in his capacity as undercover narcotics agent. Either at Laabs' suggestion or that of the defendant, but almost entirely at the expense of the former, these four people, plus a female companion of Laabs, and Willie Mapp, the third defendant in the burglary trial, on December 15 moved into a trailer which had been rented by Laabs in a northside trailer park in Casper. The record reflects that during the few days of this joint occupancy Laabs' guests paid nothing on the rent and little if anything for food which was for the most part furnished by Laabs. He also furnished liquor, wine and beer, which was freely imbibed while the burglary was under consideration and immediately prior to the break-in.[5] No arrangements for reim-

2. Laabs testified that he had previously been twice convicted of armed robbery (at ages 17 and 19), that he had commenced working as an undercover narcotics agent some two years before the trial (held in May, 1973), and had worked in some nine cities in Colorado and Nebraska as a narcotics investigator, and at the time of the trial held a "commission" as a narcotics investigator in the state of Washington.

3. Mapp's only connection with the crime appears to have been to point out the drugstore, participate in the "casing" of the premises and sit with Laabs in the latter's automobile while Raleigh was breaking the window and defendant was entering the premises. When other police officers drove up to the building these two left the scene as quietly as possible, and Mapp was arrested and charged at a later date. The record does not show what the jury did with respect to Raleigh and Mapp.

4. When the defendant and Raleigh returned to the breakdown they found the car stripped and burned and what possessions they had not been able to take with them removed, leaving them in what may be described as a very poor economic condition.

5. It is not possible to reach any proper conclusion as to the amount of alcohol that was drunk or the amount that Laabs bought. He testified on cross examination he did not drink wine himself but that the others drank quite a bit of wine, that he had furnished two bottles of wine but had "refused them a lot

bursement of Laabs for his expenditure for rental, food, and liquor seem to have been made or requested by Laabs.

It is not clear who first suggested committing a burglary, but there is no evidence at all that it was this defendant. Laabs testified that the first conversation concerning a burglary occurred on Friday evening in the kitchen of the trailer, not long after they had moved in. The idea was brought up by Raleigh who stated that he would like to pull a job of some kind because he needed money. He said that he and defendant were on the run and wanted money to get out of Casper. Raleigh thought it a good idea to hit a gas station of some kind and defendant started into the conversation with " 'If you're going to do anything we might as well do a drugstore,' " his stated reason therefor being that he wanted hard drugs. Mapp was said to have stated that he knew where there were a bunch of drugstores and that he would show them.

When asked who had first brought up the possibility of entering the Westridge drugstore Raleigh testified he could not remember, but that it was not his idea; "I presume it was Haystack's [Laabs'], because he was the one that was always saying when are we going to do it." He also testified that there was a good deal of drinking going on, mostly of wine. Mapp testified that Laabs was the one who asked him about the location of a drugstore and that he (Mapp) told him about Westridge. Defendant first testified that there was a conversation on Friday night about the possibility of committing a burglary, then corrected himself to say that there was no talk on Friday about breaking into a place and that conversations concerning burglary were on the next day, Saturday.

There is no dispute that on Friday evening Laabs, Raleigh, and Mapp drove out

to the Westridge drugstore, with Mapp as guide, and looked it over from the outside. The next morning, according to defendant, Laabs said to him, "I found a drugstore that's not bugged." Raleigh confirmed that they had been to a couple of drugstores. Laabs then requested defendant to go look at it and he said, "O.K." However, Laabs testified that it was Raleigh who had first told defendant that they had found a drugstore which was not bugged and asked defendant to look at it and he agreed. Defendant further testified that he had gone into the drugstore alone, walked to the drug counter in the back where prescriptions were filled, and then walked out. In reply to Laabs' question as to how it looked, he had said, "O.K." and that "we can look at it at night and see."

During this period of time Laabs was in continuing contact with the police department, and on both Saturday and Sunday nights the police had active stakeouts near the drugstore and observed the defendant as with Laabs he inspected the outside of the store. The owner of the store had been informed of the possible burglary, and with a key furnished by him two regular police officers entered the building on Monday evening, and were waiting when the glass door was smashed and defendant entered the building.

All witnesses, including the police officers observing the activities of defendant and his associates in the vicinity of the drugstore, were in agreement that there were a number of inspections of the premises. Defendant admitted examining the windows of the drugstore, "supposedly looking for a way in" but for the purpose of talking with Raleigh about "how we could keep from getting put out in the cold weather and still keep Haystack happy." [6] He further testified that this was part of a "game to me and Steve Raleigh, because

of wine," that on the day of the offense Landry and Raleigh had been drinking, that he had bought a pint of what is called 20/20 Mad Dog, a cheap wine, in the late morning of the 18th but that Landry was not "pretty drunk," and that while under the influence

of alcohol to an appreciable extent he was acting normally. He admitted that Raleigh was drunk when he picked him up on the evening of the 18th.

6. Very few objections were made during defendant's direct examination to his testimony

each time that we would go and see about the drugstore, or case it or something, Mr. Laabs would buy a couple of bottles of wine on the way back." When on Saturday night Laabs said they should do the job that night, he replied, "We have to look at it some more." His explanation of this was "because I didn't want to go in the first place." On Sunday night, the night of another inspection, Laabs got

> "real mad. 'If you don't do it tonight I'm going.' And we said 'O.K.'
>
> "Q Did you have any place to go other than the trailer out there? A No. He said, 'You all can keep the trailer, I'm leaving, if you all don't do it tonight.' So I thought is was all over with. I was glad, really."

At some point in the conversations defendant had told Laabs that they would need a screwdriver, hammer, flashlight, and some gloves. Laabs said he could not buy them all, and defendant admitted stealing a screwdriver from one of the local stores. Laabs in the presence of defendant purchased a flashlight and on Monday rented a hammer and chisel from a local service station at a charge of $5.00. Shortly before midnight on Monday the four drove Laabs' car to the drugstore area and according to defendant the following took place:

> " * * * Well, it was behind Westridge. He said, 'Well you all going to do it? You going to do it tonight or you're going to get out. I'm tired of this—'
>
> "Q 'Get out' of where? A Of the trailer. He had said it more than once.

And so Steve said, 'I'm not going in the place.' And I said, 'Well, I'm going to break the window.' We didn't have a plan. We didn't have anything. Because we never intended to go. We never discussed who was going to get what because we never intended to do it.[7]

* * * * * *

> "Q Go ahead. What happened out there at Westridge after he said that? A Well, we were all—to me it was a little confusing. To me. At this point. Because Steve couldn't hardly walk. He was drunk. * * * I was upset because I was fighting with my wife, but Steve—finally, we said—I simply got tired of hearing it. He kept saying, 'When you all going to do it? Do it. Do it. Do it.' I really got tired of hearing it. Steve said 'I'll break your window.' He went up and broke it. I went in the store and there was Mr. Fields with the shot gun."

Defendant contends that the evidence clearly establishes that the offense for which he was convicted was the product of the creative enterprise of the undercover agent, and relying principally upon statements from concurring or dissenting opinions in three decisions of the United States Supreme Court[8] and one decision of the Supreme Court of Michigan[9] argues that this creative activity was sufficient to establish entrapment as a matter of law so that verdict of acquittal should have been directed.

Condemnation of prosecution of crimes which have been arranged by law enforcement officers is of long standing. Thus,

---

as to what was in his mind and the purposes of these inspections. The State was similarly lenient in asking questions on cross examination permitting him to testify concerning his mental state.

7. There was ample evidence before the jury that division of the fruits of the proposed burglary had been discussed, with defendant participating. No conclusions had apparently been reached, but Laabs' share was to be less because all he was doing was driving

the car. Defendant's testimony that there was no particular plan appears to be in keeping with the facts.

8. United States v. Russell, 411 U.S. 423, 439, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) ; Sherman v. United States, 356 U.S. 369, 378, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) ; Sorrells v. United States, 287 U.S. 435, 453, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

9. People v. Turner, 390 Mich. 7, 210 N.W.2d 336 (1973).

in Saunders v. People, 38 Mich. 218, 222 (1878) Mr. Justice Marston said in his concurring opinion that courts

" * * * have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing." [10]

The cited federal decisions are equally strong in their condemnation of manufacturing cases, the summation on that appearing in United States v. Russell, *supra* note 8, 411 U.S. at 434, 93 S.Ct. at 1644, where Mr. Justice Rehnquist, speaking for the majority, states:

" * * * We are content to leave the matter where it was left by the Court in *Sherman*: 'The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, "A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." ' *Id.* at 372 [78 S.Ct. 819], quoting Sorrells v. United States, 287 U.S., at 442 [53 S.Ct. 210]."

Defendant bases his submission upon the following factual points: The lack of evidence that defendant was in any way predisposed to commit a crime prior to his acquaintance with the undercover agent; the agent had no basis upon which to investigate the defendant or to believe defendant was in any way criminally disposed; the

initial suggestion for the crime did not come from defendant; the agent provided defendant and his associates with room, food, and alcoholic beverages; the agent actively participated in all phases of the planning and commission of the crime, furnishing equipment considered necessary for the break-in, and providing the necessary transportation; and the agent on frequent occasions asked when the group were going to commit the burglary.[11] But his summary ignores evidence tending to show that he readily fell in with the suggestion of a burglary, by whomever made, countering only that a drugstore was a better subject than a service station; that he "cased" the drugstore and advised the agent as to what equipment would be needed; that he voluntarily continued to participate in discussions and inspection trips; that he himself stole a screwdriver which he had told Laabs would be desirable equipment; and that he was under no duress, coercion, or threats when he and Raleigh approached the building either for inspection purposes or the actual breaking and entering. All these acts were evidence of a freely conceived plan and attempt to burglarize the store. His explanation that he was only playing a game to keep out of the cold and enjoy the food and drink provided by Laabs, and had no intention of going through with the burglary, completely breaks down in the face of the admitted fact that when Raleigh broke the glass he did enter the building and start to steal.

This Court has recently said in Dycus v. State, Wyo., 529 P.2d 979, 981 (1974) that " 'Entrapment occurs only when the criminal conduct was "the product of the *creative* activity" of law-enforcement officials,' " quoting from Sherman v. United States, *supra* note 8, 356 U.S. at 372, 78 S. Ct. at 821, and recognized that the deter-

---

10. The appeal was disposed of by reversal upon another ground, but the concurring opinion has been much cited on the matter of entrapment.

11. Defendant's testimony was that the agent was frequently and continually urging them

to "do it, do it, do it," but Laabs' testimony was that he only asked when they were going to do it, explaining that as undercover agent in contact with the police he wanted to be able to tell the police when the burglary would take place.

mination of the conflict in evidence was for the jury.

■ Without anticipation of what our view might be should a case ever arise wherein the activity of the government has been to manufacture the crime, and conceding that the initial suggestion for the crime did not come from defendant, there is ample evidence from which the jury could conclude that it came from defendant's associate and that defendant himself was at all times an active participant in the investigation, planning (such as it was), and execution of the offense. By its verdict the jury has rejected any claim that this crime was the creation of the State. We therefore hold that whether viewed subjectively from the standpoint of the defendant's conduct and intention or objectively as to the degree of participation of the State, the defense of entrapment was not established as a matter of law.

It being a question of fact for the jury, the only real question remaining before us is the adequacy of the instructions. Defendant's requested instruction focusing upon an "intolerable degree of Governmental participation in the criminal enterprise" and violation of "fundamental fairness, shocking to the universal sense of justice mandated by the Due Pocess Clause of the Fifth Amendment" was in large part argumentative rather than instructive and we believe that Instruction 17 as given by the court was satisfactory under defendant's theory of the appeal. This instruction began with an explanatory statement concerning the defense of entrapment, clearly pointing out that the defense was one designed "to prohibit law enforcement officers from instigating criminal acts by persons otherwise innocent, in order to lure them to commit a crime," called attention to the intent or purpose of the person charged to commit a crime, that the mere furnishing of opportunities to commit a crime did not constitute entrapment, and contained these significant words, "It is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment is available." Moreover, having already instructed that the burden was upon the State to prove to the satisfaction of the jury, beyond a reasonable doubt, every essential element of the charge, the court in this Instruction No. 17 further advised the jury as follows:

"If you conclude there is a reasonable doubt whether any defendant had the previous intent or purpose to commit the offense in his case, and that he committed or participated in the offense only because he was induced or persuaded to do so by the police employee and police activity, then you must acquit that defendant.

"But, where a person has a predisposition, the willingness and the readiness to commit the crime, the mere fact that the police and the police employee provide what appears to be a favorable opportunity to do so, is not entrapment."

■ This instruction had the effect of focusing the jury's attention on all pertinent facts, including both the conduct of the State and that of the defendant. We think it was as favorable to the defendant and much more instructive than his own proffered instruction.

We cannot agree that defendant was entitled to a separate instruction on the burden of proof with respect to the defense of entrapment, as we think the foregoing clearly shows that the jury were advised in proper context where the burden of proof lay and what the State had to do in order for the jury to return a verdict of guilty.

■ The argument that the court erred in including a definition of "reasonable doubt" is without merit because the question was not raised at the time of the instruction of the jury, Haley v. Dreesen, Wyo., 532 P.2d 399 (1975), and the instruction itself did not represent fundamental error. Moreover, Cosco v. State, Wyo., 521 P.2d 1345 (1974), in which it was held that reversible error had been committed in defining the term (upon proper submission of the point), specifical-

ly advised that the opinion should be "construed prospectively and not retroactively" and would not necessarily apply to any case already tried. That decision was rendered May 5, 1974; this defendant (La-Fleur) was convicted May 7, 1973.

 Defendant's final assignment of error, that a police officer was permitted upon rebuttal to give testimony that should have been given upon presentation of the case in chief, does not outline the testimony given nor explain in any way how the course of the trial or the verdict of the jury might have been adversely affected thereby. It appears from the State's brief and the record itself that the officer was permitted to refer to a pretrial statement of the defendant perhaps inconsistent with his defense of entrapment. We have examined the record, consider the assigned error inconsequential, and adhere to previous decisions that the admission of evidence in rebuttal which is objected to as not proper rebuttal but which tends to discredit the defendant's case is within the discretion of the trial judge, State v. Alexander, 78 Wyo. 324, 324 P.2d 831, 839 (1958); Strand v. State, 36 Wyo. 78, 252 P. 1030, 1032 (1927).

The conviction is affirmed.