No. 16,466.

READ *v.* THE PEOPLE.
(221 P. [2d] 1070)

Decided August 21, 1950.

Mr. JOHN L. SCHWEIGERT, Mr. E. U. SANDOVAL, Mr. RAPHAEL J. MOSES, for plaintiff in error.

Mr. JOHN W. METZGER, Attorney General, Mr. RAYMOND B. DANKS, Assistant, for the people.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

THIS is a review of a third trial on an information filed September 30, 1945, charging the defendant with the murder of her nine-month old child, Margaret Karol Read. Within thirty days, trial was had, resulting in a verdict of second degree murder. It is said in the briefs before us in this case, that the trial judge, in granting the motion for a new trial emphatically stated pointed reasons for so doing.

The records of this court in other cases involving circumstances attendant upon this criminal charge clearly indicate that dissatisfaction arose between defendant and the counsel who represented her at the first trial upon employment by her husband. The briefs before us reveal that after the verdict in the first trial, the then counsel or her husband, made no effort toward obtaining her release on bond, and present counsel then appeared for her and bond was ordered and provided. The second trial before a different judge was had on her general plea of not guilty, June, 1948, resulting in a verdict of guilt as to murder in the second degree, with leniency recommended. At this trial the court refused to instruct other than on murder in the first and second degrees. Motion for new trial was denied and writ of error procured from this court by which error was assigned as to the refusal of the trial court to instruct on the statutory grades of manslaughter, and error in admitting defendant's written confession as not being voluntary due to her mental condition and the circumstances surrounding its procurement.

When at issue this court, by its opinion, speaking

through Mr. Justice Hays on March 28, 1949, reversed the judgment due to the refusal of the trial court to instruct the jury upon manslaughter when pertinent instructions thereon had been tendered. (*Read v. People,* 119 Colo. 506, 205 P. [2d] 233.)

The present, and third trial, was had October 3, 1949, the jury returning a verdict of voluntary manslaughter. On denial of a motion for new trial, defendant was sentenced to a term in the state penitentiary for not less than four, nor more than five, years. Error has been assigned and the case is now at issue before us.

The essence of the errors assigned for reversal is to the effect that the trial court erred in admitting, over timely objections, the ostensible written confessions of defendant, because obtained under conditions and circumstances that made the confessions involuntary and the admission of same was against the constitutional rights of defendant; and, further, that the physical and mental condition of defendant precluded a free and voluntary confession; that she was held incommunicado without benefit of counsel at the time of the soliciting and obtaining of the confessions; and, further, that in obtaining the confessions, defendant was compelled to testify against herself in a criminal case.

The confessions claimed to have been erroneously admitted in evidence, in substance, disclose a variegated and troubled domestic life and a fearful and distressing marriage relationship attended by grave anxiety for the welfare of defendant's infant daughter. Aggravated by a second pregnancy and the ills attendant thereon, and the inhuman treatment at the hands of her husband, and under constant threat of her life, defendant admitted that in a time of despondency, she shot her infant daughter, intending at the same time to shoot herself, but her courage failed in that respect. She did not want the infant to be left subject to the violence of her husband and she confessed, believing that when the state had exacted its punishment for the crime, she would find

relief by death in the gas chamber. Many more details are contained in the confession, typewritten by a stenographer of the district court engaged by the deputy district attorney to take the statement, and the statements were made in the presence of the sheriff and defendant's father-in-law, and show that the statements were signed and sworn to by defendant.

The sheriff testified that defendant was advised that she did not have to make a statement and that if made, it might be used against her, and the written statement itself, following form, shows that defendant was so advised and that no promises of immunity or favor were made to her and no coercion or threats were indulged. It is shown by the testimony of the sheriff that defendant made no request for counsel, but that she was told by the deputy district attorney that she could see no one until after the statements were signed. It appears that in the interval from Saturday morning until Tuesday morning, she was permitted to have visits with some relatives, however, an officer was always present.

Aside from the confessions, the record is barren of any proof that would sustain a verdict of guilt of the defendant, nothing else is proven by the testimony, except it established the corpus delicti. A summary of the facts were well stated by Mr. Justice Hays in the opinion following the review of the second trial of this defendant and reported in *Read v. People, supra.* The facts contained in the record now before us follow the same general pattern, and are briefly but substantially as follows: The scene of the alleged crime was at the ranch home of Ralph Read, defendant's husband, about fifteen miles south and west from the town of Walsenburg. Defendant, at about the age of sixteen, met Lewis Read, the son of Ralph Read; courtship followed until Lewis Read was called into the armed services. Defendant's home being in Walsenburg, she occasionally spent week ends at the home of Ralph Read, the father of her fiance. On one of these visits, Ralph Read induced defendant to have

sexual intercourse with him. That on returning from the armed services, Lewis Read, the son, and defendant were married. This seemed to greatly antagonize the father, Ralph Read, who immediately wrote a note to his son Lewis, advising him that he had had intercourse with defendant. Defendant, after first denying the statement of Ralph Read, later admitted it to be true, and Lewis Read, her husband, procured an annulment of his marriage to defendant. Defendant, being ashamed of the entire situation, married Ralph Read, and the infant child, shown to have been murdered in this case, was born two days less than nine months from defendant's marriage to her first husband, Lewis Read. According to defendant's testimony, her life with Ralph Read was one of continuous abuse and violence; that on September 26, 1947, the date of the alleged crime, she was pregnant with second child, which was born after the first trial heretofore mentioned; that on the day above mentioned, Rhoda Read Springer, a sixteen-year-old daughter of Ralph Read, was attending school in Walsenburg and her father, Ralph Read, drove in from the ranch for her and they arrived back at the ranch about 9:00 or 9:30 in the evening; on that day, defendant and her husband, Ralph Read, had quarrelled because he forced her to kill chickens for the market and the blood and work occasioned thereby made her violently ill and nauseated; he left for Walsenburg without her after he displayed his ill temper; that she followed him to the door and after he went out, she slammed the door, breaking the lock thereon and she threw an enameled pan on the floor, breaking off some enamel; that she was then so sick that she lay down on the bed until Ralph and his daughter returned from Walsenburg, getting up only at such times as the baby needed attention; that when Ralph came in he was mad and swearing, threw defendant's eye glasses on the floor, breaking them, threw her coat on the floor and stamped on it and tore it and ruined it; smashed her suitcase and the baby's toilet

chair by stamping on them, and kicked over other personal belongings of the defendant. He then said, "Get the baby and bed out of this house or I'll break it up, too." At that, he took the baby from the bed and fearing that he would do it some harm, she jumped up from sitting on the bed and pulled the baby away from him and sat down with the baby in her arms; he then destroyed the baby's bed with his hands and feet by getting on top of it with his feet (a picture of the bed is an exhibit, also the glasses and coat and other articles were before the jury showing the violence of defendant's husband, Ralph Read); that Ralph then ordered her out of the room while he changed his clothes to do his milking, and ordered her to leave the baby in the bedroom with him; that she took the baby with her into the living room while he changed his clothes and went back into the bedroom and sat on the bed holding the baby in her arms, and it was then alive; that while in that position, Ralph struck her a terrific blow on the mouth and chin with his fist, snapping her head back, making everything whirl and knocking her down on the bed; that the last she saw the baby alive was just before that blow was struck. She further testified that while she was down he twisted her leg, threatened to kill her and was stopped by his daughter, that she heard their voices which sounded far away; she did not know how she got into the living room from the bedroom, or how long she sat there; that there was terrific pain and blood from her wounded mouth and sensations of alternating dark and light. She further testified as to seeing Ralph in the doorway; of asking him to take her to town; also signing some agreement which Ralph had prepared; and overhearing Ralph's daughter Rhoda say, "Dad, don't do that or I'll send you to the pen." That immediately following this partially described occurrence, Ralph and Rhoda went out to the barn to do the milking and while defendant was in this dazed condition, Ralph Read left Rhoda at the barn and came into the house, and accord-

ing to defendant's testimony, the baby was lying on the bed in the bedroom; that defendant wanted Ralph to take her to Walsenburg, which he refused, and she went out into the dark, starting on the way afoot; while on the way she heard a car overtaking her and she stepped into the bushes fearing that it was her husband, Ralph; later in the night, exhausted and weary, she lay down for rest until daylight; that she suffered from the cold of a late September night; that she then started on her way and was overtaken by her father-in-law who picked her up and said to her, "This is terrible, what you have done to Ralph." He drove her on into Walsenburg, insisting that she have a cup of coffee, which was not available at the moment; that they wanted to go to her father's place in Walsenburg but they were not at home; her father-in-law then took her to the sheriff's office where the proceedings relative to the taking of the confessions occurred.

It is shown by the record that on one prior occasion she escaped the violence of her husband and went to Walsenburg and requested the sheriff's office to go out and bring her baby to her, which they did. She testified that she did not know all that was asked, or her answers in the taking of the confession, but that there were continuous questions and that she was still dazed and her mind in a whirl, and she did not know of her admitting killing the child, and positively stated she did not kill it; that she thought the baby was alive until she picked it up from the bed and when asked by Rhoda if she thought one blanket was enough for the baby, she wrapped another blanket around it and then discovered that it felt limp and queer. In the first instance, she went out to the car where Ralph was seated with a big rifle in the seat beside him and she got in the back seat with the baby and some argument started and she went back in the house and laid the baby on the bed and that Ralph finally came in and then, due to his threats and violence,

she went out into the dark and made the trip to Walsenburg just described.

Pertinent to this statement of facts concerning the results of the violent attack upon her, we quote the clear description given by Mr. Justice Hays in *Read v. People, supra,* as follows: " * * * that upon being struck by her husband everything went black and her head 'roared and whirled' to such extent that she did not know and does not now know what became of the baby; that while she was in a semiconscious condition her husband continued to assault her by twisting her leg and shouting numerous threats that he was going to kill her; that prior to and during said assault defendant's husband called her many vile and indecent names; that the defendant in describing the effects of said assault upon her said: 'Well, my head was roaring awfully bad, and my mouth there where he had been hitting, was hurting awfully bad, and it just seemed everything would be bright for a minute and I would see something and could tell what it was and then everything would be black and I wouldn't know what was going on or anything else. It was just like a vacuum.'"

As in the former and second trial, and as stated in the opinion just referred to, defendant's testimony in the present case was not contradicted on any material question. From a reading and careful analysis of the record before us, we venture to say that no one could with any feeling of certainty come to an honest conclusion as to exactly what happened during the few moments surrounding the attack upon defendant and the death of the child. Ralph Read, either the father, grandfather or stepfather and grandfather of the murdered child, seems to be the only person who could know exactly what happened, remains silent, undoubtedly for reasons best known to himself. He was endorsed as a People's witness in the second trial, but was never called to take the stand. Due to his stated relationship to the child, his testimony was admissible

under the ruling in the case of *O'Loughlin v. People,* 90 Colo. 368, 10 P. (2d) 543.

It is interesting to note the comment of the Attorney General on page 24 of his answer brief herein where it is said: "We can well appreciate why the defense would rather not have the jury hear *from the only other party having direct knowledge of the matters* testified to by the defendant." In the present case after defendant testified in her own behalf, he was called by the people for rebuttal, timely objections were made to his testifying which were sustained because of the limitation it would place upon defendant in cross-examination, being compelled to follow the course pursued in the direct examination on rebuttal. In brief, the foregoing presents only the highlights of the circumstances surrounding the alleged offense. Further detail of the revolting treatment accorded defendant by her husband, a man approaching fifty years of age, during the period when defendant, then only twenty-one years of age, suffering the pangs of her transgression induced by him prior to her marriage, and in her shame, feeling that she had no one else to turn to, would be only to emphasize and unduly lengthen this opinion.

The question now before us rests squarely upon an answer to the question: "Was the confession involuntary; did the trial court abuse his discretion in admitting it; and was the jury properly instructed after a denial of defendant's tendered instruction?" While the question of the refusal of the tendered instruction is not specified as error, we cannot, in determining the first question and procedure involved, overlook a discussion of the likely results that followed the refusal to give the tendered instruction.

It is apparent that the district attorney felt secure in resting the prosecution upon a confession stating on its face that it was voluntary, when this reliance was coupled with the silence of the only possible witness as to the facts. It is obvious that the trial technique of the

prosecutor was spearheaded to give full force to the question of admission of the confessions and thereby the condemning admission against interest would be under the eyes of the jury. This is supported by the fact that James Read, father-in-law of defendant, who picked her up on the highway, and testified at the hearing before the trial judge out of the presence of the jury as to what defendant said, was never called as a witness in the case.

We find no clear expression of the trial court in its ruling upon the admissibility of the confession when objections were aptly made. It does seem that the trial court was inclined to the view that it was a matter for the jury to pass upon, and that impression is gleaned from the following part of the record at the close of the hearing by the trial court. out of the presence of the jury on the question of admissibility:

"Mr. Schweigert: We have a lot of authority on the question.

"The Court: I don't think you need to argue the matter. You gentlemen may save your exceptions, the exhibits will be admitted at the proper time. *I know* what your arguments will be and I may be wrong, but if so, the Supreme Court will correct me.

"Mr. Moses: Note the exceptions of the defendant.

"The Court: It is not for the Court to say whether they are true or not, the Jury will pass upon that question.

"Mr. Schweigert: If the Court please, that was the mistake the Court made in the previous decision.

"The Court: If I felt that to be true, it would be different, it is the law of this state, it is a matter for the Jury to pass upon, I think it is sufficiently shown under the laws of this state that the Court would make a mistake in not admitting it. Bring in the Jury please."

Because, according to some decisions of this court, it seems the defendant is entitled, if a confession is admitted in evidence, to have a jury, under proper instruc-

tions, pass upon, not only the weight to be given to the confession, but to determine whether the confession is voluntary or not and reject the same, does this action on the part of the trial court, as indicated by his remarks, disclose a yielding to the temptation afforded to avoid the primary duty of determining whether the confession is voluntary or not, by leaving it to a jury? If such a course is open by our decisions, we have no criticism of the trial court availing itself of the privilege, but we now propose to try to set at rest any doubt as to the procedure in such cases.

▆ Considering the final remarks of the trial judge hereinbefore set out, we are persuaded to the view that it is more of a failure to exercise his discretion than it was its abuse. The court undoubtedly knew that it would be no error to admit a voluntary confession and leave it to the jury to determine its weight under the proper instructions. Technically, the determination of the admissibility of a written confession is a mixed question of law and fact, primarily one of law, which a jury is not trained to determine. In the early case of *Fincher v. People,* 26 Colo. 169, 56 Pac. 902, the true rule is set out as follows: "It was the province of the *court alone* to determine whether the confession was made with that degree of freedom which would render it admissible as evidence * * *. This rule rests upon the proposition that the competency of evidence is a legal question, which must be determined by the court, and its credibility by the jury." The opinion further states: "The trial judge, on a conflict in the evidence, regarding the voluntary character of the statement purporting to be the confession of the defendant, resolved the question in favor of the people, and its admission under such circumstances, *being, to some extent in the discretion of the court,* his action in this respect cannot be disturbed * * *."

It is pertinent to here make note that there was no conflict in the testimony relating to the mental and physical condition of defendant at the time of making the confes-

sion. Again, in *Mitchell v. People,* 76 Colo. 346, 232 Pac. 685, Mr. Justice Burke stated, "that the whole difficulty is with the facts establishing confessions, not with facts established by confessions; with the weight of evidence, not the character of evidence. Weight is for the jury, character for the court."

We are not foreclosed from an independent examination of the character, and the admissibility of the confessions by the ruling of the trial court herein or any finding by the jury since there is no conflict in the evidence on the question presented. The judge gave no indication that the mental condition of defendant was considered. This is made manifest by its instruction No. 35 given to the jury which seems to confine the consideration of the jury to the proposition of whether or not the confessions were obtained upon promises.

It is claimed that the question of whether or not the confession was voluntary was submitted to the jury and, by its verdict, the question was resolved as being voluntary. With this claim we cannot agree because, if it had been proper to submit this question to the jury, it was submitted under insufficient instruction as we will later comment. We now say, and reiterate, with the hope of finality, that henceforth to determine the question of admissibility of written confessions, the same as all other proffered evidence, is solely the duty of the trial court. Any error that might attend can be corrected on review. If there be a reasonable doubt in the mind of the trial court, that doubt should be resolved in defendant's favor by the denial of admission. Any other course could be dangerous and prejudicial to the rights of the accused. However, according to the general rule as written down in the decided cases, where there is a conflict in the evidence as to the voluntariness of a confession, it is proper that the court instruct the jury that if they do not believe the confession was made freely and voluntarily, they are at liberty to disregard it in arriving at their verdict.

320

We repeat the time-honored rule that confessions are to be received with great caution. There is no dispute of defendant's testimony as to the circumstances and happenings within the few hours preceding the taking of her alleged confession. A summary of these events should unmistakably convince the ordinary person that the physical results thereof on defendant left her in an irresponsible mental condition. It is not denied that she was pregnant; sick from the pregnancy; violently abused, physically and mentally, by her husband; beaten into a semiconscious condition; and, after listening to the many threats and witnessing the acts of violence on the part of her husband directed toward herself and her child, she, not being made of iron, surely was in a condition of great despair. Within approximately twelve hours following the main events, she was put upon inquiry by the sheriff and deputy district attorney. It is not denied that this confused mental condition existed at the time the confessions were obtained. It is of no consequence how the condition was caused. Existing, it was sufficient to destroy the effect of the confessions as not being the product of a free and normal mind. "A statement, to have been voluntarily made, must proceed 'from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous, disturbing cause.'" *Tuttle v. People*, 33 Colo. 243, 79 Pac. 1035. What had happened to the defendant immediately prior to the taking of the confessions should have been recognizable by the inquisitorial officer, but if not there, it was plainly and without dispute, stated to the trial judge on preliminary examination. As a judge, he should not have overlooked what was bound to be his observation as a man. It is to be easily perceived that what had happened to defendant would be far more disturbing than any ordinary threats or coercion. That being so, her confessions lack the elements necessary to allow them to be determined as voluntary. It is our opinion that the confessions so made were not

a free and voluntary statement against interest and that it was error for the trial court to not so find and determine, and the admission in evidence thereof constituted reversible error.

In this case, even under the apparent theory under which the trial court admitted the confessions and submitted same to the jury, which we have not approved, the jury did not have a fair chance to properly weigh and obtain the effect of the confessions, much less whether they were voluntary in the true sense, because of the refusal to give the last paragraph of defendant's tendered instruction No. 1, permitting them to consider the mental condition of defendant and other factors. This instruction, in toto, is as follows:

"The Court instructs the Jury that it is a rule of law that a confession of one when freely and voluntarily made is evidence against the one making such confession. The confession, however, should be strengthened by facts and circumstances corroborative of its truth. In this case, if you believe that the defendant, Beulah Ann Read, freely and voluntarily made the confessions which have been introduced and read to you, then you should give them such credit and weight as you deem them entitled to.

"On the other hand, if you find and believe from the evidence that the confessions were neither freely or voluntarily made, or were obtained from the defendant upon promises made to her which operated upon her mind and inspired her in the hope of escaping punishment or the hope of other benefits to her, then you should, in arriving at your verdict, disregard any part or all of such confessions which you may deem unworthy of credence.

"In determining whether the statements were made freely and voluntarily, you may consider the age, maturity, physical and mental condition of the defendant, the length of her confinement, her opportunity or lack of opportunity to seek friendly or professional aid, the ad-

vice or lack of advice given her as to her constitutional rights, and all other facts and circumstances surrounding such confessions."

"Marked: 'Refused, 1st part given.' "

On the whole, we must conclude that the defendant did not have a fair and impartial trial, and in view of the fact that without the confessions—which we have condemned—being in evidence at another trial, there is nothing perceivable in the record which would justify the expense to the state and the ordeal of a fourth trial of the defendant. We believe justification for this determination is to be found in the fact that in three trials, for some unexplained reason, competent witnesses were not called to disclose facts known to them that would throw much light on this prosecution.

The judgment is reversed and the cause remanded with direction to dismiss the information.

Mr. Justice Jackson concurs in the result.

Mr. Justice Stone dissents.