Randy MAYER, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5273.

Supreme Court of Wyoming.

Oct. 20, 1980.

Michael Schilling, Appellate Counsel, Wyoming Public Defender Program, Laramie, and Neil J. Short, Casper, signed the brief and appeared in oral argument on behalf of appellant (defendant).

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division and John W. Renneisen, Law Clerk, Criminal Division, Cheyenne, signed the brief and Vicci Colgan, Legal Intern, appeared in oral argument on behalf of appellee (plaintiff).

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROONEY, Justice.

After a jury trial, appellant–defendant was convicted of first–degree murder. He appeals from the judgment and life sentence resulting therefrom, contending that: (1) statements made by defendant were improperly admitted into evidence, (2) a post–death photograph of the victim was improperly admitted into evidence, and (3) the trial court improperly refused to instruct the jury to disregard a remark made by the prosecutor in the rebuttal portion of the closing arguments.

We affirm.

## ADMISSION OF STATEMENTS INTO EVIDENCE

At about 3:00 a. m. on March 25, 1979, appellant was interviewed at the Natrona County Sheriff's Office. He related the incidents of that night as they pertained to the death of Wesley Stone, the homicide victim, and he signed a written statement concerning the same. Additionally, the interview was recorded on tape; and, after it was transcribed the next morning, appellant made corrections on it and signed it.

Appellant was advised of his constitutional rights as required by *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but he contends that his statement was not given "voluntarily, knowingly, and intelligently" because he "was seventeen years of age, intoxicated, was suffering from physical injuries incurred from a severe beating, was emotionally overwrought and had been deprived of the counsel of his mother."

In the statements, appellant related that he had been on a double date during the evening hours of March 24, 1979. At about 12:15 a. m. on March 25, 1979, he drove to the Safeway parking lot on CY Avenue in Casper where his date had parked her automobile. Milton Brummett then opened appellant's car door and began to attack him. The two fought, and appellant was beaten. He then went to the Hall of Justice to make a complaint. He was given a form to fill out and bring back the following Monday. Feeling that his complaint was not properly received by the police, he drove to his home and obtained his 12–gauge shotgun and a box of shells. When he returned to his automobile with the gun and shells, his mother followed him and got in the automobile with him. Another automobile came along side of his automobile and stopped. Appellant thought that Brummett was driving it. He loaded the gun and shot and killed Stone, the driver of the automobile.

■ The test of admissibility of a confession is whether or not under the totality of the circumstances the waiver of constitutional rights and subsequent statements were given voluntarily, knowingly and intelligently. *Jarrett v. State,* Wyo., 500 P.2d 1027 (1972). The trial court here conducted a hearing on appellant's motion to suppress the statements to determine their admissibility. Thereafter, the court ruled that the statements were admissible inasmuch as they were made "* * * voluntarily, after thorough advice of constitutional rights, and that the defendant knowingly, intelligently, and voluntarily waived his rights * * *." Thus, the trial court ruled that the prosecution had carried its burden of

proving the same by a preponderance of the evidence. *Raigosa v. State*, Wyo., 562 P.2d 1009 (1977); *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

A review of the record supports the ruling of the trial court. The interviewing officers testified that at the time of arrest, before and during the questioning, appellant was coherent, cooperative, able to understand, and willing to answer all questions. He did not appear to them to be intoxicated. The *Miranda* warnings were given to him by the officer who transported him to the Hall of Justice, and again by the officer taking the statement before doing so. Appellant expressed understanding each time. Prior to questioning, he was asked if he wanted his mother present and he answered "no." (Appellant's mother had been brought to the Hall of Justice by a deputy sheriff immediately after appellant was taken into custody.) The evidence does not reflect that the injuries to appellant were so severe as to deprive him of his capacity to comprehend and appreciate the nature and consequences of the statements. *Kennedy v. State*, Wyo., 422 P.2d 88 (1967); *Lonquest v. State*, Wyo., 495 P.2d 575 (1972). The same can be said of his degree of intoxication—.09% on the blood alcohol test administered about one hour and fifteen minutes after the interview began. Appellant had a scrape on his chest, a split lip and a lump by his right eye "approximately a quarter or half–inch high, about the size of a 50 cent piece" and a black eye. He was very angry. As he said in his statement, "I got madder and madder and I grabbed my shotgun and a box of shells." The excessive speed used by him in driving to the Hall of Justice for the purpose of making a complaint, his impatience at having to fill out a complaint form and at having to return on Monday to sign it before a police magistrate, the act of mistaking Wesley Stone for Brummett and shooting Stone as a result of the mistake reflect his anger. His occasional sobs while being booked and during the interview and the very words of the statement, i. e., "Right after I shot, Man I rolled the window up and just freaked ... because I realized what I had done" (punctuation not supplied), reflect the emotion of remorse. These emotions, in themselves, however, do not reflect the inability to comprehend or appreciate the nature and consequences of his actions.

Appellant also recognized the pertinency of the testimony of Stone's companion and its potential as adverse to appellant. Immediately after the homicide, appellant offered him "a thousand dollars to testify for him." After the taped statement was transcribed, appellant took 45 minutes to review it for accuracy.[1] He made nine changes in it. One of the changes was to correct the information originally given to the effect that he had consumed two "very light screw drivers" during the evening. In making the correction he wrote, "I had a lot more to drink than I advised Mr. Benton." Mr. Benton was the officer who conducted the interview. Appellant's companion did not consider appellant as "drunk."

Appellant acknowledges that "any one of the factors of youth, deprivation of parent counsel, emotional turmoil, intoxication, and pain as a result of physical injury, standing alone would not per se render the statements involuntary." In this he was correct. *Mullin v. State*, Wyo., 505 P.2d 305 (1973); *People v. Hocking*, 15 N.Y.2d 973, 259 N.Y.S.2d 859 (1965); *People v. Taylor*, 16 N.Y.2d 1038, 265 N.Y.S.2d 913 (1965); *Hernandez v. State*, Wyo., 587 P.2d 1094 (1978); *Lonquest v. State*, supra; *Mortimore v. State*, 24 Wyo. 452, 161 P. 766 (1916). But, we cannot agree with appellant's contention that the several factors taken together are sufficient in this case to mandate a reversal of the trial court's determination that the appellant gave his waiver and the statement voluntarily, knowingly and intelligently.

1. The typed statement consisted of 96 questions and answers. Most questions and answers were of a length to be typed on one line – the answers consisting of one or a few words. Several answers were of a length to be typed on three or four lines and up to twelve lines.

There may be instances in which any one or more of the factors of age, intoxication, physical injuries, lack of parental contact, or mental trauma would be sufficient to evidence a waiver of constitutional rights or a confession as involuntary. An examination of the cases cited by appellant in support of his argument reflects the circumstances in each are far more aggravated and severe than those in this case. The trial court relied upon the factual situation as presented to it by the evidence, and it considered the totality of the circumstances surrounding the transaction. Such evidence as gauged against such standard supports the findings of the trial court. *Lonquest v. State,* supra; *Jarrett v. State,* supra.[2]

## ADMISSION OF PHOTOGRAPH INTO EVIDENCE

■ Appellant contends that a photograph of victim's head and shoulders taken at the coroner's office, and depicting the marks made by the shots was unduly prejudicial and without probative value. It was admitted into evidence over appellant's objection. The objection was argued out of the presence of the jury. The court said:

"* * * Well, since the issue of self defense has been raised, at least through the opening arguments,[3] it seems to be one thing the Jury will have to assess in evaluating a self defense claim, as to whether or not the magnitude of the forces in defense was comparable to the magnitude of the threat, and it seems to me the photo does have some bearing on that question, and considering that it is the only photo of this type, which the Prosecutinon [sic] intends to introduce, I think it does have some probative value on that issue, which would outweigh its prejudicial effect. Therefore, I will overrule the objection and allow the exhibit in."

Appellant then requested the court to instruct the jury that the photograph was admitted for a limited purpose, and that emotion, passion and sympathy are not to come into play in deliberating in this case. The court did so in the words requested by appellant.

The general law relative to admission of photographs into evidence is summarized in *Reeder v. State,* Wyo., 515 P.2d 969, 972 (1973) as follows:

"Generally the question of admission of photographs is left to the reasonable discretion of the trial court. *Linn v. State,* Wyo., 505 P.2d 1270 at 1276, and cases cited; *Dickey v. State,* Wyo., 444 P.2d 373 at 377.[4] However, in any case of which we are aware in which a photograph was deemed properly admitted it had some probative value. This principle would seem to be applicable to the admission of any exhibit, for if that which is offered has no probative value there would appear to be no reason for its admission. The term 'probative' as it applies to evidence means that it furnishes, establishes or contributes towards proof. *Akin v. Estate of Hill,* 201 Kan. 306, 440 P.2d 585 at 590. * * * Photographs are properly received into evidence to enable the jury as the trier of facts to better understand that which the photo represents. *Alcala v. State,* Wyo., 487 P.2d 448 at 456, reh. den. 487 P.2d 467, cert. denied 405 U.S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466,

---

2. Appellant did not testify. The facts contained in the statement concerning the fight with Brummett, the effort to make a complaint at the police department, and the shooting itself were also placed in evidence through testimony of appellant's companion, his mother, and the victim's companion. Appellant recited in his statement that he believed the victim to have been Brummett and that he saw him raise his right hand and "it looked like he was pointing a pistol at me, or something." Thus, the statement was the primary means of placing the theory of self defense before the jury.

3. Appellant had previously said, in making an objection, "It is not probative of whether Randy Mayer acted in self defense or any other reason, nobody suggested Wesley Stone hadn't died, suggested that Randy Mayer didn't shoot the gun, we stipulate to that fact."

4. Also see *State v. Lindsay,* 77 Wyo. 410, 317 P.2d 506 (1957); *State v. Alexander,* 78 Wyo. 324, 324 P.2d 831 (1958), cert. den. 363 U.S. 850, 80 S.Ct. 1630, 4 L.Ed.2d 1733 (1960).

reh. den. 406 U.S. 911, 92 S.Ct. 1613, 31 L.Ed.2d 823, and *Dickey*, supra, 444 P.2d at 378. * * * "

The case was defended on the theory of self defense. Considerable attention was given to evidence concerning the victim's position at the time of the shotgun blast, i. e., whether or not he was turned toward appellant, as claimed by appellant or whether or not he was leaning forward, head slightly turned and hands on the steering wheel as recited by victim's companion. A pathologist and a firearms expert testified relative to the pattern and distribution of the lead pellets in giving opinions as to the probable distance between the victim and the gun and as to the position of the victim at the time. The trial court determined that the photograph would serve to better understand such testimony and contribute toward the proof of the "magnitude of the forces in defense" compared to the "magnitude of the threat." The discretion thus exercised was not abused.

"A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. * * * " *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980).

## CLOSING ARGUMENT OF PROSECUTING ATTORNEY

Appellant contends that he was denied a fair trial because the prosecuting attorney said in the rebuttal portion of his closing argument:

"* * * Let's, I submit that the defendant Randy Mayer had a license to kill anybody who could have driven by at that time that night, it could have been you, could have been me, could have been our children, could have been anybody. Think about it."

Appellant argues that the comment is improper "in that it appeals to the jurors' fears, is calculated to inflame the passions and prejudices of the jury, and injects issues broader than the guilt or innocence of the Defendant thus diverting the jury from its duty to decide the case on the evidence."

Appellant objected at the time the comment was made and moved for a mistrial. After the motion was denied, appellant asked for an instruction to the jury to disregard the comment. The request was denied.

The comment standing alone and out of context could be an improper appeal to passion and to the jurors' fears. However, appellant's closing argument was directed to his theory of self defense. In it, he spoke of the right to use deadly force against an assailant when he had reasonable grounds to believe and actually did believe he was in imminent danger of death or serious bodily harm. He emphasized the position of Brummett in the case, detailing the evidence that Brummett had threatened appellant and that Brummett had beaten him. Appellant argued that his reaction in obtaining the gun and leaving the house "to face Brummett" was a result of the conflict with Brummett. Finally, he contended that the gun was loaded, aimed at the victim and fired by appellant in the belief that the victim was Brummett. The incidents pertaining *to Brummett* were emphasized as that which justified the use of deadly force *against the victim*. The only mention of incidents relating to the victim which could give rise to a use of deadly force in resistance was appellant's belief that victim raised his hand and appellant thought there was a pistol in it.

In rebuttal argument, the prosecuting attorney argued that Brummett was not the one shot and that appellant had shot and killed the wrong person. He argued that the evidence reflected a disregard by appellant for human life. And then he said:

"Also there is an instruction on the issue of retreat. You heard all about the ten seconds, heard the defendant was in his car, had been around the block, direct

testimony, nothing in front of him, nothing behind him, only 31 feet away from his own house even. The opportunity for retreat was more than clearly there. Do count that ten seconds out, Ladies and Gentlemen, it was ten seconds before the defendant, before he shot Wesley Stone in the head, not ten seconds before something else happened, not ten seconds before some kind of external act or external force, consider it, Ladies and Gentlemen, self–defense? Look at the evidence. This is a case of self–defense? Let's, I submit that the defendant Randy Mayer had a license to kill anybody who could have driven by at that time that night, it could have been you, could have been me, could have been our children, could have been anybody. Think about it."

The prosecuting attorney was speaking to appellant's contention that appellant's anger against, and fear of, Brummett was a defense for his shooting of victim or of any other person. In the contention and in the argument against the contention, both parties were relating the same to the evidence produced at the trial.

 The scope of permissible argument by counsel to the jury is within the discretion of the trial court and will not be disturbed unless there is a clear or patent abuse of the discretion. *Oldham v. State,* Wyo., 534 P.2d 107 (1975); *Boyd v. State,* Wyo., 528 P.2d 287 (1974); *State v. Spears,* 76 Wyo. 82, 300 P.2d 551 (1956). In closing arguments, counsel may comment on the state of the evidence as a help to the jury in understanding it and in applying the law to it. *Boyd v. State,* supra; *Ross v. State,* 8 Wyo. 351, 57 P. 924 (1899).

 The questioned comment was not repeated or given other emphasis. *Six Feathers v. State,* Wyo., 611 P.2d 857 (1980); *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In its instruction to the jury, the court directed the jury to disregard as evidence any statement made by counsel concerning the facts of the case.

In this instance, we do not find that the trial court acted in a manner exceeding the bounds of reason under the circumstances in not sustaining the objection to the questioned comment and in not giving an instruction to disregard it. See *Martinez v. State,* supra.

Affirmed.

McCLINTOCK, Justice, dissenting.

Because a confession is to be admitted into evidence with great caution, *Read v. People,* 122 Colo. 308, 221 P.2d 1070, 1076 (1950), I cannot agree with the majority that Mayer's confession was properly admitted into evidence. In discussing the question of whether a statement made by the defendant while being interrogated was voluntary, this court said in *Dryden v. State,* Wyo., 535 P.2d 483, 490–491 (1975):

"*Maki v. State,* 18 Wyo. 481, 485–486, 112 P. 334, 335 (1911) clearly holds that the right not to testify against oneself is a constitutional right. Concerning the burden of proof with respect to in–custody statements, it is said:

" ' * * * It is the general rule that self–incriminating statements are not per se admissible over objection, when the evidence discloses that the defendant was in custody for the crime charged at the time of making such statements, unless shown to have been voluntarily made. Under this rule, there is no presumption that such statements are voluntarily made, but, on the contrary, the presumption is the other way, and upon the trial of an accused the burden is upon the state, seeking to prove such statements, to show their voluntary character.'

"The voluntary character of the statement where the accused is under arrest cannot be shown 'without also showing that he had the benefit of counsel or was fully informed of his rights.' Voluntary statements are said to be those which ' "proceed from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous disturbing cause," ' quoting from *State v. Clif-*

*ford*, 86 Iowa 550, 53 N.W. 299, 41 Am.St. Rept. 518.

\* \* \* \* \* \*

" \* \* \* The question is not whether the examining officers have been 'unfair' to the accused; it is whether the State has proved that the statements were freely made by an informed and knowledgeable accused after full and proper warning as to his constitutional rights."

When this court is presented with the question of whether a confession was given voluntarily, it must review the undisputed facts in the record and then make its own determination. As the United States Supreme Court stated in *Stroble v. California*, 343 U.S. 181, 190, 72 S.Ct. 599, 603, 96 L.Ed. 872 (1952):

"This Court has frequently stated that, when faced with the question of whether there has been a violation of the Due Process Clause of the Fourteenth Amendment by the introduction of an involuntary confession, it must make an independent determination on the undisputed facts."

While I have no disagreement with the facts provided by the majority, I believe that it is necessary to look at the facts leading up to and after the shooting more carefully in order to determine whether the confession was in fact given voluntarily. As the majority have correctly pointed out, in determining whether a confession was given voluntarily, this court must consider the totality of the relevant circumstances. *Jarrett v. State*, Wyo., 500 P.2d 1027, 1030 (1972). Randy Mayer, who was seventeen at the time that the incident occurred, spent the early evening hours of March 24, 1979, at a party with a friend, Trenton Venture. Both young men were drinking before and during the party. There is also some testimony that Mayer had been smoking marijuana before the party. After leaving the party around 11:00 p. m., the two young men picked up two girls who were driving around. These girls left their car in the Safeway parking lot. The foursome then drove around drinking. They consumed a six pack of Michelob and some mixed drinks.

Around 12:15 a. m., the foursome returned to the Safeway parking lot so that the girls could pick up their car. Trenton Venture testified that when Mayer was kissing one of the girls goodnight, Milton Brummett opened the car door on the side where Randy Mayer was sitting and kicked Mayer. "Randy tried to pull away and Brummett grabbed him and pulled him out of the car." Brummett then kneed Mayer in the head. Mayer then got back into the car. After this, the details of the fight are somewhat confusing; however, it appears that Mayer got out of his car and that both Mayer and Brummett had tire irons. At one point Brummett attempted to stab Mayer in the chest with the tire iron. Mayer was eventually able to get back into his car.

After the fight, Mayer and Venture headed directly to the Hall of Justice to report the assault. Venture testified that Mayer was "running stop lights and [was] very shaken up." Venture described what happened at the police station:

"We went up to the window and the lady in there, she saw us, and got up and came to the window, and I was talking to her, Randy, he was, you know, I had just kind of taken over, I was going to deal with them, you know, because Randy, he was really shaken up, and I told her we wanted to file assault charges, and she got some papers and sent us into another room to fill them out."

The young men were also told to bring the form back at 9:00 a. m. on Monday.

When asked to describe the dispatcher's attitude toward the young men, Venture stated at trial, "She was pretty bored, she wasn't going out of her way for us, you know." Venture also testified that while they were at the police station, Mayer was acting "pretty irrational." The young men were given a form to fill out; Venture testified that:

". . . we went into that other room and Randy had said something, he said, you know, kind of burst out, you

know, didn't think things were going fast enough. You know, said if something doesn't get done I am going to shoot him, you know, and the watch commander came out and he told Randy to shut up, and Randy, he settled down, you know, and went into the other room and sat down, and I started filling out the papers, you know, and I was reading the lines to him, and then telling him what I was writing down, you know, and he wasn't saying anything, you know, kind of shaking and he was crying and I got about halfway down the page, and he just got up and said, This isn't going to do any good, and walked out."

In his confession, Mayer describes the events after the fight in the following way:

". . . I boogie down, . . . Cy, probably doing 90 to 100 miles an hour . . . that fast, I went through every red light all the way down Center Street right . . . came here and tried to fill out a complaint and nothing seemed satisfactory I was swollen, I was sore, I was mad, I saw Trent bleeding so I boogie home . . ."

After returning home, Mayer got a shotgun and headed for his car. His mother apparently seeing the gun ran after Mayer and jumped into his car. Mayer's mother testified that after driving one block Mayer stopped the car and that at this point he was shaking. Mrs. Mayer described what transpired after the car was stopped:

"A. I was yelling at him and telling him what happened and that I was in my pajamas and housecoat and he had to take me back home, and he said, and he turned on the light, and he said, Don't you understand I have been verbally assaulted, and I looked at his face, and I said, you don't mean verbally assaulted, Randy, you mean you have been beaten up.

"Q. Could you make out any observations about his physical condition?

"A. Yes. He was sobbing and shaking and crying and he said that, and he had a red puffy eye and a gash under his eye and his lip was split.

"Q. Did he tell you what had happened to him?

"A. Yes.

"Q. What happened to him, what did you learn?

"A. That Milton Brummett had beat him up.

"Q. Did he talk about what he did after he had been beaten up?

"A. Yes. He went to the Sheriff's Department and they didn't help him.

"Q. Did he continue to drive down Riverbend or what did he do?

"A. No. I told him that, to back up and take me home because I would go down to the Sheriff's office and that I would prefer assault charges, that I was over 21 and that they would listen to me, and he said, Okay."

Upon the request of his mother, defendant returned to his home and parked in front of his house. Immediately after this, a car pulled alongside Mayer's car and stopped. After seeing the car Mayer exclaimed, "Shit, it is Brummett, Brummett." Mayer's mother stated that she heard the driver of the car yell, "Hey, you bitch" and that she saw him point something at Mayer. Mayer then loaded his shotgun and mortally wounded the driver of the car. The driver was not Milton Brummett, but Wesley Stone, an innocent third party who had nothing to do with the feud between Mayer and Brummett.

Had someone at the police station taken time to talk with the two boys when they came in to report the assault this tragedy may well have been prevented. It is obvious that while the boys were at the police station Mayer was shaking and crying and that the watch commander must have been somewhat aware of this emotional turmoil because he came out of his office and told Mayer to "shut up." While I recognize that police personnel are not trained psychologists, I believe that they have a duty to talk with a crime victim in order to insure that victim that the police will make every effort to see that the perpetrator is apprehended and punished. If the victim is merely handed a form and the police make

no effort to talk with him, the victim may feel that the police are not going to take any action. And, like Mayer, the victim may decide to seek his own revenge.

After the shooting, Mayer was transported to the Criminal Justice Center. While Officer Benton does not recall telling Mayer's mother that she could not ride to the station with her son, Mrs. Mayer testified that Officer Benton did not allow her to ride to the station with her son. Mrs. Mayer did, however, go to the Criminal Justice Center.

Once Mayer was in the police car, he was advised of his *Miranda* rights. After arriving at the police station, at approximately 2:00 a. m., Mayer was immediately escorted to the booking room. Officer Keister described the emotional condition of Mayer at that time:

"... I was standing outside in the corridor trying to find out what was actually going on in relation to what charges were to be put down on the booking card, when I observed him [Mayer] sort of slump in the seat, I wasn't exactly sure what was going on. I started to walk back in and at this point the Nurse—matron Nichols began to console him or patting him on the back, talking quietly to him. I realized he was crying and I just backed off."

Officer Sandfort observed Mayer's physical condition. The officer testified that Mayer had a lump on the side of his face that was "[a]pproximately a quarter or half an inch high, about the size of a 50 cent piece," and that he probably had a split lip. Mayer also had an abrasion on his rib cage.

While Mayer was being booked, Officer Sandfort read Mayer his *Miranda* rights again, and Mayer signed the waiver of rights. He was also asked at this time whether he wanted to have a lawyer present and if he would like to have his mother present. He answered "no" to both of these questions.

During the time that Mayer was being questioned Mrs. Mayer made repeated requests to see her son and also stated that he had a right to have a lawyer. As Mrs. Mayer testified:

"... there was a blonde officer there and I told him that Randy was only seventeen, and that I wanted to, I had a right to be with Randy, or he had a right to have a lawyer, and he was abrupt with me, he said, No, Ma'am, he is in interrogation."

Officer Benton testified that when he talked with Mrs. Mayer he told her that "I was going to talk to Randy." Officer Benton did not advise Mrs. Mayer of her son's *Miranda* rights, and refused to let her be with her son during the questioning, or to talk with him before the questioning. Officer Benton also testified that during the time that Mayer was being interrogated Benton received several telephone calls from the dispatcher; however, he could not recall the exact reason for these calls. As he testified:

"It is hard to remember if she [Mrs. Mayer] asked to come in. I don't remember, I don't remember what the dispatcher told me."

A breath test was eventually given to Mayer at 4:10 a. m., some two hours after he was booked. His blood alcohol level at that time was .09. Mayer was still under the influence of alcohol when he arrived at the Criminal Justice Center. As Officer Sandfort testified: "at first when we arrested him [Mayer] he seemed nervous, maybe slightly intoxicated."

Mayer contends that his statement was not given voluntarily because at the time the interrogation took place, he "was suffering from ... a severe beating, was emotionally overwrought." In addition, he was seventeen years old, intoxicated and "had been deprived of the counsel of his mother." I agree.

The physical condition of the accused is a relevant factor in determining whether his confession was given voluntarily. In *People v. O'Leary*, 45 Ill.2d 122, 257 N.E.2d 112 (1970), the Supreme Court of Illinois held that the trial court should have suppressed a confession that was given while the defendant was still suffering from being shot

with tear gas. Likewise, in *Read v. People*, supra, the Supreme Court of Colorado held that a confession was not voluntary because at the time that it was given the accused was still suffering from great despair after being beaten by her husband. The court described the events leading up to the confession in *Read* as follows:

". . . A summary of these events should unmistakably convince the ordinary person that the physical results thereof on defendant left her in an irresponsible mental condition. It is not denied that she was pregnant; sick from the pregnancy; violently abused, physically and mentally, by her husband; beaten into a semiconscious condition; and after listening to the many threats and witnessing the acts of violence on the part of her husband directed toward herself and her child, she, not being made of iron, surely was in a condition of great despair. Within approximately twelve hours following the main events, she was put upon inquiry by the sheriff and deputy district attorney. It is not denied that this confused mental condition existed at the time the confessions were obtained. It is of no consequence how the condition was caused. Existing, it was sufficient to destroy the effect of the confessions as not being the product of a free and normal mind. . . ." 221 P.2d at 1076–1077.

Here, after Mayer was beaten up by Brummett, he was irrational; he was shaking and sobbing. And while some may say that he overreacted to this confrontation, the fact still remains that he was overwrought with emotion. At the time he was interrogated by the police, a mere two hours after the beating, this confused mental condition still existed. Therefore, I do not believe that the confession was given voluntarily. As the *Read* court stated:

" ' * * * A statement, to have been voluntarily made, must proceed "from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous disturbing cause." ' *Tuttle v. People*, 33 Colo. 243, 79 P. 1035, 1038, 70 L.R.A. 33, 3 Ann.Cas. 513." 221 P.2d at 1077.

Not only was Mayer suffering from a beating and the resulting mental turmoil, but he had also been drinking up until a few hours before he was interrogated. As the record indicates, even two hours after the interrogation began defendant's blood alcohol level was just .01 percent less than what is necessary to create the legal presumption of intoxication. While this court has never held that intoxication will automatically render a confession involuntary, it has in the past considered whether the degree of intoxication is sufficient to render a confession involuntary. *Kennedy v. State*, Wyo., 422 P.2d 88, 90 (1967). Here, if defendant had only alleged that his confession was not freely given because he was intoxicated, I might have found the intoxication in this instance to be insufficient to suppress the statement. However, because of the other factors, I believe that defendant's intoxication had a direct bearing upon his ability to freely give a statement to the police.

The final factor that I believe has some bearing upon the voluntariness of the statement is defendant's age. Even though I recognize that this court in the past has not given much credence to a minor's right to have the counsel of a relative, a lawyer, or an interested adult before he gives a statement, *Mullin v. State*, Wyo., 505 P.2d 305, 309 (1973), I do not accept this view of law as being consistent with the trend of decisions. See *Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

The United States Supreme Court has addressed the question of the admissibility of statements made by juveniles on several different occasions. For example, in *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed.2d 224 (1948), the Court held that even though the juvenile defendant had been given his constitutional rights and waived them his statement must be suppressed. In so holding the Court stated:

" * * * That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This

is a period of great instability which the crisis of adolescence produces. A 15–year–old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. * * * He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him." *Haley*, supra, 332 U.S. at 599, 68 S.Ct. at 304.

Haley was 15 years old at the time that he was interrogated by the police. He was arrested around midnight at his home and was taken to police headquarters. There is also some evidence that he was beaten. The record also reflects that "[f]ive or six of the police questioned him in relays of one or two each. During this time no friend or counsel of the boy was present. Around 5 a. m.–after being shown alleged confession of Lowder and Parks–the boy confessed." *Haley*, supra, 322 U.S. at 598, 68 S.Ct. at 303.

In *Gallegos v. Colorado*, 370 U.S. 49, 54–55, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325, 87 A.L.R.2d 614 (1962), the United States Supreme Court stated:

"[A minor] cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights–from someone concerned with securing him those rights–and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14–year–old boy would not be able to know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights."

The Pennsylvania Supreme Court in *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974), held that because the state failed to establish that the juvenile's waiver of his constitutional rights was made knowingly and intelligently, the trial court erred when it failed to suppress the defendant's confession. The reason that the state failed to meet its burden stemmed from the fact that

". . . the record indicates that the Commonwealth first attempted to exclude appellant's mother from the interrogation and then, when she finally gained access, did not afford her an opportunity to advise her son privately about his constitutional rights, although she indicated that she wished him to be a afforded the right of counsel . . ." *Roane*, supra, 329 A.2d at 289.

The court also stated:

"An important factor in establishing that a juvenile's waiver of his constitutional rights was a knowing and intelligent one would be evidence that, before he made his decision to waive those rights, he had access to the advice of a parent, attorney, or other adult who was primarily interested in his welfare." *Roane*, supra, 329 A.2d at 288.

In the case at bar, as the majority have already pointed out, the record indicates that when Mayer was being booked, he was asked if he wanted to talk with his mother or an attorney, but that he answered, "no." The majority appear to rely upon his answer of "no" to relieve the police of their duty to let Mayer's mother see her son even though she indicated that she wanted him to talk with a lawyer.

Because of Mayer's emotional state and his mother's desire to talk with him and advise him of his need for a lawyer, I believe that the police officers should have been required to let Mrs. Mayer talk with her son. I do not advocate that the police should have forced Mayer to talk with his mother, but they at least had the duty to take Mrs. Mayer to her son so that she could attempt to talk with him, or discontinue their interrogation until Mrs. Mayer

arranged for an attorney to come to the station to talk with Mayer. Because of his emotional state at the time that he was taken to the police station, I do not believe that he waived his right to the advice of his mother merely because he said "no" when asked before the questioning began if he wanted to see his mother.

I have mentioned *Re Gault* as evidencing the modern approach to the use of juvenile statements and confessions. That case, as well as the decision of the Supreme Court of New Jersey in *In re the State of New Jersey in the Interest of Carlo*, 48 N.J. 224, 225 A.2d 110, 119 (1966) gives great importance to parental awareness of what is taking place and that parents be given opportunity to consult with their children. The Supreme Court of New Jersey said:

" * * * The refusal by the police in the present case to permit the parents access to their sons during the interrogations might well be sufficient in itself to show that the confessions were involuntary even though, as the police testified, the boys did not wish to see their parents. Boys of 13 and 15 lack the judgment to appreciate the seriousness of the situation and the harm which they may do themselves by yielding to the pressures of insistent police questioning."

While Mayer was somewhat older than the boys just mentioned, it is clear that he was intoxicated, emotionally upset and physically beaten. The totality of the circumstances indicates that the confession made by him did not "proceed 'from the spontaneous suggestion' of [his] own mind, free from the influence of any extraneous disturbing cause.'" *Tuttle v. People*, 33 Colo. 243, 79 P. 1035, 1038, 70 L.R.A. 33 (1905), quoting from *State v. Clifford*, 86 Iowa 550, 53 N.W. 299, 41 Am.St.Rep. 518 (1892). I believe, therefore, that the trial judge erred in failing to suppress the statement.

Having concluded that Mayer's confession was inadmissible, the conviction in the case at bar should be reversed, since the erroneous admission of the confession is under all circumstances prejudicial. As the United States Supreme Court stated in *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964):

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . and even though there is ample evidence aside from the confession to support the conviction."

Cited with approval in *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 408, 57 L.Ed.2d 290 (1978), and *Dryden*, supra, 535 P.2d at 497.

I would reverse the conviction and remand the case for new trial without use of Mayer's statement.

ROSE, Justice, dissenting.

I would have reversed this conviction and remanded for a new trial because of the remark made by the prosecutor in his closing statement to the jury:

". . . Let's, I submit that the defendant Randy Mayer had a license to kill anybody who could have driven by at that time that night, it could have been you, could have been me, could have been anybody. Think about it."

As the majority points out, the trial court denied the appellant's requests for both a mistrial and an instruction to disregard this remark.

I am unpersuaded that the context in which this part of the argument was made blunts the stark impropriety of the remark when considered in isolation. As the majority points out, the comment was made to rebut the defendant's claim of self–defense. But the issue is whether or not it constituted a proper and nonprejudicial argument to rebut appellant's claim of self–defense.

In *Jones v. State*, Wyo., 580 P.2d 1150, 1154 (1978), we discussed prosecutorial misconduct and quoted with approval § 5.8(d) of the ABA Standards relating to the Administration of Criminal Justice (Approved Draft 1971), which says:

" '(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.' "

The prosecuting attorney's comment was a patent attempt to inject an issue broader than the guilt or innocence of the defendant *under the controlling law.* The import of the prosecutor's remark—which focuses on the innocence of the victim—was clearly calculated to attack the validity of a claim of reasonable but mistaken self–defense. Nothing the majority says about understanding the context of the comment alters this.

The statement of the State's attorney was also an appeal to prejudice and passion. The, "It could have been [might be next time] you [your daughter]" statement is well recognized as reversible error. In *Commonwealth v. Harvell,* 458 Pa. 406, 327 A.2d 17 (1934), the Pennsylvania Supreme Court, citing, *inter alia,* the ABA Standards we approved in *Jones, supra,* held reversible error a prosecutor's closing comment in which he said: "But it might be one of you next time." The Pennsylvania Supreme Court noted that such a statement is an "ill–concealed [attempt] to divert the inquiry from the pursuit of truth and an invitation to give vent to visceral and unreasoned responses." 327 A.2d at 30. In *State v. Vickroy,* Iowa, 205 N.W.2d 748, 751 (1973), the Supreme Court of Iowa said, "The prosecutor undertook to inflame the fears, passion and prejudices of the jury . . . by inferentially urging the jurors to place themselves and members of their families in a hypothetical position of peril created by a drunken, car operating defendant." In *State v. Groves,* Mo., 295 S.W.2d 169, 174 (1956), the Supreme Court of Missouri said, "The argument made in the instant case was a direct effort to bring home to each juror (who had a daughter or granddaughter–and we may safely presume some did) the fear that if defendant be permitted to remain at large he might rape the daughter or granddaughter of that juror. Once such a fear entered the mind of a juror, he would find it difficult to consider this verdict with the objectivity required of an impartial juror. . . ."

Although the prosecutor's comment in our case is clearly erroneous–and proper objection was made–we also said in *Jones, supra,* at p. 1154:

"There remains for consideration whether by virtue of this misstatement, a substantial right of the defendant was adversely affected. The right with which we are concerned is the fundamental right to a fair trial, free from tainted argument. [Citation.] A reversal and remand for a new trial–because of prosecutorial misconduct–will not be ordered as punishment for a prosecutor's misdeeds, but only because such misdeeds denied the accused a fair trial. [Citation.] . . . ."

It seems to me that a defendant who kills an innocent bystander and then pleads that he killed the victim under a mistaken but reasonable belief that he was acting in self–defense is placed in a uniquely tenuous position. This is so because we are all appalled at a mistake–however honestly made–which has, as its consequence, the wrongful taking of life. I view the prosecutor's remark as an improper, but devastatingly effective, attempt to exacerbate the precarious self–defense position that the defendant did adopt, and one which he had a legal right to adopt.

I would have reversed and remanded for a new trial.